**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Frank DeVOE, Defendant-Appellant.**

**No. 73–1562.**

United States Court of Appeals,
Fifth Circuit.

May 3, 1974.

Melvyn Kessler, Miami, Fla., for defendant-appellant.

Robert W. Rust, U. S. Atty., Robert C. Byrne, Harold F. Keefe, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, and GODBOLD and SIMPSON, Circuit Judges.

PER CURIAM:

Pursuant to the limited remand directed by our February 8, 1974 opinion in this cause, United States of America v. DeVoe (5 Cir. 1974), 489 F.2d 158, the district court held an evidentiary hearing on February 28, 1974. In addition to receiving testimony of the defendant-appellant Frank DeVoe, and the confidential government informant, Joe C. King, the court heard the testimony of three government witnesses, Detective

Sergeant Robert Silber of the Hollywood Florida Police Department, Detective Marco Ceritelli, of the Organized Crime Unit of that organization, and Mr. Michael Patrick Sullivan, Assistant U. S. Attorney for the Southern District of Florida. The defendant-appellant's counsel, Mr. Melvyn Kessler, was sworn and gave evidence. The court took note of the prior trial testimony, of the appellate record before this court in this appeal, and of the briefs, motions and administrative rulings therein. One evidentiary exhibit was received, the original statement made by the informant Joe C. King to Detective Sergeant Silber on July 6, 1972, describing the alleged heroin transaction the subject of the indictment and conviction of Frank DeVoe.

Based upon the foregoing, the trial judge has certified to this court under date of April 3, 1974, his detailed findings, conclusions and recommendations. This document is reproduced as an Appendix to this per curiam order. It is precise, objective and well documented, and needs no elaboration at our hands.

■■■ We approve and adopt the recommendations of the distinguished trial judge. The purpose of the limited remand having been accomplished, we now affirm the judgment of conviction appealed from.

Affirmed.

## APPENDIX

### CAPTION AND CLERK'S CERTIFICATE OMITTED

### CERTIFICATION TO COURT OF APPEAL (sic) ON DEFENDANT'S MOTION FOR NEW TRIAL

After having been remanded by the Court of Appeals for the limited purpose of considering the defendant's motion for a new trial based on newly discovered evidence filed in this Court after the appeal from his judgment of conviction had been pending for several months, this cause is before the Court for the entry of the "appropriate findings of fact and conclusions of law as to whether the conviction of DeVoe should be permitted to stand." This Order incorporates those findings and conclusions.

### I

The facts involved are set forth briefly in the opinion remanding this cause, United States v. DeVoe, 489 F.2d 158 (5th Cir. 1974), and need not be repeated here. Suffice it to say that the defendant was convicted by a jury of two counts relating to the sale of approximately one gram of heroin on July 5, 1972. The sale allegedly involved DeVoe, Detective Thomas and a confidential informant [hereinafter referred to as CI]. When the defendant's attorney, at trial, requested information relating to the whereabouts of the CI because of the defendant's possible desire to subpoena him as a witness, the government offered testimony by a DALE agent to the effect that there were no statements made by the CI which would be favorable to the defendant. In addition, the Assistant U. S. Attorney represented to the Court that the CI's life would be endangered by the disclosure of his identity. Based on this information, together with the Court's review of the law relating to confidential informants, see e. g., Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957); United States v. Fallings, 482 F.2d 1352 (5th Cir. 1973), and United States v. Clark, 482 F.2d 103 (5th Cir. 1973), the Court allowed the CI to be described[1] and the questions relating to his availability to be answered.[2] Testimony as to the CI's

---

1. Agent Charette testified that "[t]he person was approximately five foot, ten, medium build, Negro male, . . ." Transcript of trial at 62, United States v. DeVoe, No. 72–595–Cr–CA [hereinafter cited as Transcript].

2. Out of the presence of the jury, Government counsel disclosed to the Court and defense counsel that the CI was then incarcerated in Broward County, although when the jury returned the question by the defense as to his availability only elicited the response

actual location was not allowed.[3] At no time during either trial did defense counsel request the identity of the informant. In point of fact, he disclaimed such a request on at least two occasions in the second trial.[4] Because of this disclaimer of interest the CI was not identified.[5]

After the denial of the defendant's pro forma motion for a new trial following the jury verdict of guilty, DeVoe was sentenced by the Court. An appeal was filed January 29, 1973, the record on appeal was sent to the Court of Appeals on March 6, 1973; this motion for new trial based on newly discovered evidence was filed March 21, 1973, and amended on April 10, 1973. It was clear to the defendant that the District Court has no jurisdiction to entertain such a

motion while the appeal was then pending, and for that reason he filed a motion with the Fifth Circuit to Remand Cause to Trial Court in the hopes of receiving a ruling on the motion for new trial. An administrative panel denied that motion on June 21 and denied a rehearing on July 16, 1973. After receiving notification from the Court of Appeals that the defendant's motion to remand had been denied, and realizing that no jurisdiction existed to entertain the motion for a new trial based on newly discovered evidence, the Court denied that motion without prejudice to refiling at the conclusion of the appeal.[6]

Under the procedure employed by the Court of Appeals the motion for new trial based on newly discovered evidence has in essence been reactivated and is

that the CI was within the Southern District. Transcript at 77, 88 and 90.

3. There was some confusion on the government's part as to the meaning of the word "availability" as used in this context. At one point the government made the announcement that "[w]e do not think he is available, Your Honor." Transcript at 78. The word related to the CI's actual physical presence within the district as opposed to the actual decision to allow him to testify. As to the former, the statement was incorrect, as was demonstrated by Agent Charette's later testimony before the jury. Transcript at 90. *See* note 2 *supra*.

4. Transcript at 78–80.

5. During the course of the discussions relating to the availability of the CI, defense counsel announced: "But I did not go into the identity of the witness. I do not feel that I have laid sufficient predicate at this point to go into the identity of the confidential informant." It is clear, then, that the decision not to release the identity of the CI, *per se*, is not under review here. Rather, the question relates to the possible *Brady* testimony that might have been elicited from the CI. The non-disclosure of his identity is relevant only insofar as it bears on that question.

6. The Assistant U. S. Attorney was criticized by the Court of Appeals for not meeting "the thrust of appellant's contentions." 489 F.2d at 160. A cursory review of the briefs filed on appeal demonstrates that this criticism was justified, although perhaps some further explanation would be appropriate.

As indicated in the text of the Fifth Circuit's opinion, the defendant was challenging as violative of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the government's withholding of the identity and whereabouts of the CI. The Point on Appeal, as phrased by the appellant DeVoe, was clear in this regard:

Whether the prosecution by failing to disclose the identity of a confidential informant or place him on the stand, violates Fifth Amendment Due Process when said informant, who played a major role in the criminal activity complained of in the indictment, could totally exonerate the defendant from the charges in the indictment.

Brief for Defendant/Appellant at 6, United States v. DeVoe, 489 F.2d 158 (5th Cir. 1974).

Notwithstanding this clear indication of the issue on appeal, the government in its brief devoted four and one-half pages to its argument that

1) No evidence had been suppressed; and

2) The District Court acted correctly in denying the defendant's motion for new trial based on newly discovered evidence.

The second point relied on by the government was obviously a *non sequitur* since the motion had not been denied on its merits. The Order of July 2, 1973, indicated as much on its face. As to whether evidence favorable to the accused had been suppressed, whether in good faith or bad faith, the brief made only the conclusory assertion that no such evidence existed. This was clearly not what the Court of Appeals needed to review this issue.

now properly before this Court for findings and certification. The motion alleges that although the identity of the CI was not released during either trial in the District Court, the defendant has learned his identity,[7] and that Joe C. King (the CI) has given a sworn statement exculpating Frank DeVoe from any complicity in the sale of heroin on July 5, 1972. As the Court of Appeals summarized:

> The appellant urges that his conviction be reversed under the circumstances now brought forth. The appellant suggests two possible views of the actions of the prosecution: (1) that the prosecution knew that if the informant came forward he would deny the testimony of the agents, and that the suppression was thus knowingly carried out; and (2) that the prosecution was acting in good faith and did not suspect that King was prepared to repudiate his prior identification and inculpation of DeVoe. In either event, it is asserted that *Brady's* teachings mandate a new trial.

489 F.2d at 160.

Having the order of the Court of Appeals, the Court is of the opinion that two questions must be answered at this point and they are somewhat intertwined: (1) Did the government know that Joe C. King, the confidential informant in the case of United States v. Frank DeVoe, had changed, or would at trial change, his testimony that it was Frank DeVoe who sold the heroin to him and Agent Thomas on the night of July 5, 1972; and (2) Was the statement given by Joe C. King in the office of Mr. Kessler, the defendant's attorney, voluntarily and truthfully given or was it coerced or false? The first question can be summarized as the *Brady* question—did the government withhold information favorable to the accused? The second question concerns the existence of newly discovered "evidence"—notwithstanding the government's ignorance of a possible change in testimony would such a change require a new trial for the defendant in the interests of justice.

## II

At the conclusion of the hearing held by the Court in compliance with opinion of the Court of Appeals an announcement was made concerning the first question posited above:

> THE COURT: On the basis of the record before me at this time, I find no Brady material circumstance with respect to the Government's knowledge or failure to disclose prior to the occasion of the two trials involving this defendant.

7. At the hearing held by the Court on this matter the following question was asked of the government: "When was the name of Joe C. King first disclosed?" The Assistant U. S. Attorney stated that the response to the defendant's motion for new trial admitted that Joe C. King had been the CI on this case, but he was not sure when or how Mr. Kessler learned of that fact. Mr. Kessler, the defense counsel, opined that it may have been disclosed during a sidebar conference, but that he was not sure of that and would therefore rely on the record. Transcript of Proceedings, United States v. DeVoe, February 28, 1974 [hereinafter cited as Hearing] at pp. 46 and 87.
The fact is that the CI's identity was not disclosed at either trial, during a bench conference or otherwise, although because of the government's unusually casual handling of this case it may as well have been. During the second trial, at the same time the Court was being told that the CI's life would be in danger and almost in the same breath, the announcement was made that the CI was presently incarcerated in the Broward County Jail. It did not take much deductive power to arrive at the identity of the CI once the defendant reviewed the Court's docket sheet in this cause, which is a public record and available in the Clerk's office during business hours, because item 12 on that docket sheet reflects the following information:
Nov. 8 DeVoe: Writ of Habeas Corpus ad Prosequendum issued to USM, for Joe C. King from Broward County Jail, for purpose of giving testimony at trial 9:30 a. m., on 11/8/72.
Since this was the only writ requested, the CI's identity was established.

The defendant did not seriously contend that anyone connected with the government knew that Joe C. King would make a statement exculpating Frank DeVoe, although his counsel refused to concede the matter.[8] It is not necessary to decide now whether the government would have had an obligation to disclose to the defense the existence of the statement by Joe C. King should it have been given to someone other than the defense attorney after the trial.[9] The testimony is clear that even up to the day of trial the government attorneys firmly believed that the CI, Joe C. King, would testify in conformance with his written statement given the day after the sale in question. No attempt was made to determine whether he had ever given another statement prior to trial, either to the government attorneys or agents, that varied in any material respect from the statement elicited July 6, 1972. Absent such a showing the Court is compelled to find that no change in testimony existed, and *ipso facto*, no government attorney could have suppressed such information in violation of the commands in *Brady*.

### III

The next question that must be answered is whether or not the statement given by Joe C. King to Mr. Kessler justifies the grant of a new trial to the defendant. The standards to be applied in this instance are derived from the analysis of two very closely analogous areas of criminal law and they are: (1) the recantation of testimony given by a material witness; and (2) the discovery of *Brady* material by the government before trial. The law on the first point is clear.

As the Fifth Circuit has observed in United States v. Nolte, 440 F.2d 1124, 1128 (5th Cir. 1971), "Motions for a new trial based on recanted testimony of a material witness are looked upon with the utmost suspicion." The Supreme Court in Mesarosh v. United States, 352 U.S. 1, 77 S.Ct. 1, 1 L.Ed.2d 1 (1956), pointed out:

It must be remembered that we are not dealing here with a motion for a new trial initiated by the defense, under Rule 33 of the Federal Rules of Criminal Procedure, 18 U.S.C.A., presenting untruthful statements by a Government witness subsequent to the trial as newly discovered evidence affecting his credibility at the trial. Such an allegation by the defense ordinarily will not support a motion for a new trial, because new evidence which is "merely cumulative or impeaching" is not, according to the often-repeated statement of the courts, an adequate basis for the grant of a new trial. (footnote omitted)

352 U.S. at 9.

No issue is taken with the allegation that the "evidence" was discovered after the trial, nor with the defendant's assertion that he was diligent in pursuing the defense. What must be evaluated, however, are the requirements that "the new evidence [must] be material and such that, if presented to a jury at a new trial, would probably produce an acquittal." Shuler v. Wainwright, 341 F. Supp. 1061, 1069 (M.D.Fla.1972). Recently this last element was mentioned in Ross v. Texas, 474 F.2d 1150 (5th Cir. 1973):

. . . In our estimation, the likelihood of changing a jury's decision as

---

8. Hearing at 82.

9. At one point in his argument to the Court the defense counsel stated to the Court that under the precepts of *Brady* the government was bound to disclose exculpatory evidence discovered both before and after the trial. THE COURT: But the Government has to have some knowledge of it [the existence of the subsequent change in testimony], of course.

MR. KESSLER: Yes, but the Government doesn't have to have knowledge at the time. If the Government comes into knowledge later, say at a later date, it wouldn't make any difference they still have the burden of coming forward and divulging that to the defense at any time, whether before, during or after the trial. Hearing at 83.

a result of newly discovered evidence must rise considerably above the level of speculation. Otherwise, finality would be a vanishing element from all judgments of conviction in criminal cases.

474 F.2d at 1153.

█ The analogy to the Brady v. Maryland case is not quite as clear, but can be seen to exist when the philosophy of that decision is explored.

The principle of Mooney v. Holohan [294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935)] is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly.

373 U.S. at 87. Even though the government may not be required to alert the defense to exculpatory developments subsequent to trial, and at this point the Court is assuming that it is not, the discovery by the defense of that same information may serve, in appropriate circumstances, to call into question the fairness of the earlier trial for the same reasons explicated by Mr. Justice Douglas in *Brady*. Unfairness may have crept into the trial unexpectedly and should therefore be corrected in a new trial if the evidence was material to the outcome. Even in the *Brady* instance, though, some guidelines are apparent.

. . . We do not, however, automatically require a new trial whenever "the combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict. . . ." United States v. Keogh, 391 F.2d 138, 148 (CA2 1968). A finding of materiality of the evidence is required . . . . if "the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury. . . ." Na-

pue v. Illinois, *supra,* 360 U.S. 264 at 271, 79 S.Ct. at 1178, 3 L.Ed.2d 1217. Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972).

█ The decision has been made that no *Brady* material existed prior to trial, so the government cannot be held to have, unwittingly or otherwise, suppressed evidence favorable to the accused. A new trial would have been automatic otherwise. *Giglio, supra* at 155. What we are confronted with is the discovery of information that would have been Brady material had it existed before trial. Because it didn't then exist an automatic new trial is not mandated. Rather, this newly discovered evidence must meet the standards discussed in Ross v. Texas, *supra,* before a new trial would be appropriate.

A synopsis of the "newly discovered evidence" is advisable now. On July 6, 1972 Detective Robert Silber of the Hollywood Vice and Narcotic Unit Office took a statement from Joe C. King that described, *inter alia,* the purchase of approximately one gram of heroin from Frank DeVoe. Instead of summarizing the statement, a short quote from the statement will be sufficient:

I again got into Detective Jim Thomas' car, we drove to the north side of West Side Park in Dania and parked the car. We then left the car and walked over to Frank DeVoe's house. We walked up to Frank DeVoe's house and knocked on the door and he told us to come in. I then advised Frank DeVoe, Detective Jim Thomas wanted to cop some stuff. Frank DeVoe stated that he did not want to give this stuff to Detective Jim Thomas and for me to take the money from Detective Jim Thomas and to give it to him and then he would give me the heroin. Detective Jim Thomas then handed me $20 which I handed to Frank DeVoe and Frank DeVoe took a packet of heroin from his pocket and handed it to me at which time I handed it to Detective

Jim Thomas. Frank DeVoe then told me the next time that I came to his house with anybody that he wasn't going to let me in and if I ever wanted to buy heroin that I would have to come by myself. At this time Detective Jim Thomas and myself left Frank DeVoe's house.

The substance purchased by Detective Thomas and Joe C. King was subsequently analyzed and found to be heroin. The same Joe C. King who gave that statement came to the defense attorney's office on February 8, 1973, accompanied by DeVoe and a white female,[10] and gave a sworn statement before the court reporter denying each of the particulars contained in his earlier statement to the Hollywood police. He denied going to DeVoe's house on July 5, 1972, accompanied by agents or otherwise; he denied buying heroin from DeVoe; and he denied being searched after the alleged purchase. In substance he completely exculpated the defendant, Frank DeVoe, from any participation in the heroin transaction charged in the indictment.

Absent any extenuating circumstances, and accompanied by the government's acknowledgment that the individual making the February 8 statement was the same as the individual who made the July 6 statement that they relied on,[11] this newly discovered evidence would clearly be sufficient to justify a new trial. True, the testimony of Joe C. King was not necessary to obtain the conviction in the first instance. However, the actions of the CI were testified to by Detective Thomas at the trial and the CI's repudiation of that testimony could very well affect the credibility of Detective Thomas. "[T]he likelihood of changing a jury's decision as a result of newly discovered evidence [would] rise considerably above the level of speculation." Ross v. Texas, 474 F.2d at 1153.

Nevertheless, a review of the testimony elicited at the hearing on remand evidences the existence of extenuating circumstances. The informant testified that the statement given to DeVoe's attorney was false and was given under duress. He further testified that the original statement of July 6, 1972, was true.[12] Mr. King refused to be sworn by the clerk on two occasions prior to his testifying at the hearing, but it was obvious to the Court that he was in great fear of his life at that time and was obviously reluctant to testify. He seemed to be under the impression that as long as what he said was not under oath he would not be harmed by the defendant or his friends. His testimony did describe at least two occasions between the trial of the defendant and the hearing that day when he had been, to his mind at least, threatened by either DeVoe or his friends.[13] This was in ad-

---

10. The testimony at the hearing discloses a discrepancy in this regard. Agent Ceritelli testified that on February 9, 1973, the day after the interview with DeVoe and his attorney, Joe C. King called him. After Ceritelli picked him up and took him to the DALE office, King explained what had occurred the previous day. According to Ceritelli, King said that DeVoe, a white female, and two other black males accompanied him to Mr. Kessler's office. Hearing at 32. Assistant U.S. Attorney Sullivan, the man to whom the story was related, could not recall whether King mentioned the presence of any men other than DeVoe. Hearing at 25. King at the hearing testified that only DeVoe and the white female accompanied him. Hearing at 73. The discrepancy, however, does not appear to be material.

11. The Government's Response to Defendant's Motion for New Trial admitted that Joe C. King was the CI in this case. See note 7, supra.

12. "Q Mr. King, here is a statement that is Government's Exhibit 1 with your signature on it. Is that statement true?
A Yes, sir.
Q Is the statement that you gave the court reporter in Mr. Kessler's office false?
A Is that Mr. Kessler sitting back there with glasses on?
Q No, over here. At the lawyer's office with Frank DeVoe?
A With Frank?
Q Yes.
A It is false
Q Did you do that under duress and fear?
A Yes."

13. Hearing at 56.

dition to the threats he felt he received when he was taken by the defendant to Mr. Kessler's office for purposes of giving the February 8 statement.[14] Although the informant was not as eloquent as he might have been, the message relayed to the Court was nevertheless clear—he had only given the statement to DeVoe's attorney because he had been threatened with bodily harm or death if he didn't.[15] At the time the request was made to give a statement relating to his participation, he had no reason to refuse it. He was secure in the knowledge that they could not be sure he had been the informant—the government had promised that his identity would not be discovered.[16] When Joe C. King was confronted with the realization that DeVoe did know that he was the CI, he tried to protect himself in the only method still available—by refusing to testify at all, or at least under oath.

▆ The story finally came out, albeit grudgingly. The witness's refusal to be sworn affects the weight to be given to his testimony, but under the peculiar and bizarre facts of this case the Court credits Joe C. King's version of the facts, and finds that the February 8, 1973 statement given to Mr. Kessler was false when given, and made only under duress and threat of physical harm.[17] When viewed in this light, it would be this Court's conclusion that the interview of Mr. Joe C. King conducted by defense counsel is not newly discovered evidence at all, but only "manufactured" evidence. The Court is convinced that Mr. Kessler was not aware of the coerced nature of the responses elicited by his questions, but they were nevertheless involuntary. It has been the defendant's contention throughout that he is entitled to have a new trial so that the jury will have a chance to weigh the credibility of Joe C. King for itself. While that would be true if the statement was voluntary, such involuntary, "manufactured" evidence can never justify a new trial. The credibility of any witness should never be impeached by statements given under threat of death or great bodily harm. "Otherwise, finality would be a vanishing element from all judgments of convictions in criminal cases." Ross v. Texas, 474 F. 2d at 1153. Were it up to this Court,

---

14. Hearing at 25.

15. This threat was credible. The trial transcript contains an elementary example of what happens to informants these days.
REDIRECT EXAMINATION OF DONALD J. ALIMEDA, JR.
"Q What were you in the hospital for?
A Well, on June 23rd I had part of my brains knocked out. I had seven stiches and plastic surgery, from somebody that I had turned in. This dope addict hit me and that was it. I stayed in the hospital 11 days and I am still suffering from it."

16. Hearing at 56–57.

17. The defendant, through his attorney, attacked the credibility of the CI's fear for his life. On several occasions he questioned the government's witnesses seeking to find out what measures had been taken to protect the CI, such as moving him to another part of the country, changing his identity, etc. Hearing at 28 and 38. He determined that little, if anything, had been done to protect the CI, and theorized that obviously the police did not take seriously the CI's fears. Hearing at 83–84. That conclusion is not necessarily the only one that can be drawn under the circumstances. Prior to the filing of the motion for new trial based on newly discovered evidence, there was no reason for the CI to leave Dania because he was sure that no one knew he had been the informer against DeVoe. After his participation became known, it would have been appropriate to assist him in relocating if the CI qualified for protection under the Organized Crime Control Act of 1970, 18 U.S.C. prec. § 3481, but he obviously did not. Without such authorization, the government could do nothing but be willing to come to his assistance if he actually was harmed. However, that protection may prove to be illusory.
It is truly unfortunate that, due to an attorney's inadvertence, Joe C. King must now live in fear, realizing all too well his circumstances and the government's inability to assist him. As Mr. King put it in his testimony, "I am just as good as being a policeman. I don't have a badge or gun, though." Hearing at 60.

the motion for new trial based on newly discovered evidence would be denied for failure to adduce any competent, newly-discovered evidence.

Entered at Miami, Florida this 3rd day of April, 1974.

C. CLYDE ATKINS
United States District Judge