**UNITED STATES of America**

v.

**Ruben CONTRERAS–MENDOZA, et al.**

**No. 4:04–CR–156–A.**

United States District Court,
N.D. Texas,
Fort Worth Division.

April 1, 2005.

Frederick M. Schattman, U.S. Attorney's Office, Fort Worth, TX, for Plaintiff.

Kirk M. Claunch, Claunch Law Office, Fort Worth, TX, for Hector Vazquez.

*MEMORANDUM OPINION*
and *ORDER*

MCBRYDE, District Judge.

Before the court for decision is the motion of defendant HECTOR VAZQUEZ ("Vazquez") for new trial. The court has concluded that the motion should be granted.

## I.

### *Background*

#### A. *The Indictment and Trial.*

Vazquez was named in a one-count indictment filed September 22, 2004, that charged Vazquez, Ruben Contreras–Mendoza ("Contreras"), Hector Arturo Ramos ("Ramos"), and Fidel Aguilera ("Aguilera") with knowingly and intentionally possessing with intent to distribute more than five kilograms of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). By order signed November 5, 2004, the indictment was dismissed as to Ramos pursuant to the government's motion on the ground that the government doubted that it could carry its burden of proving beyond a reasonable doubt that Ramos participated in the offense charged by the indictment because it had concluded that the information upon which the indictment against Ramos was based was not credible. The case against Vazquez was tried to a jury on November 8, 2004. At that time Contreras and Aguilera were fugitives. Following a brief trial, the jury, after deliberating several hours, returned a verdict the early evening of November 8, finding Vazquez guilty of the offense charged by the indictment.

The pertinent trial evidence may be summarized as follows:

The drug transaction charged by the indictment involved an aborted sale to an informant of ten kilograms of cocaine. Contreras had negotiated the purchase of the drugs from the informant, and was to exchange money for the drugs when the sale took place. The sale was to take place in the parking lot of a Wal–Mart store at the border between Arlington and Fort Worth, Texas, during the middle of the afternoon on May 12, 2004. Three

vehicles were identified by the officers as being involved in the transaction: a Ford Econoline van, which Contreras drove to the parking lot, a Ford Expedition, and a pickup truck that arrived after the other vehicles. The ten kilograms of cocaine were brought to the parking lot in the Expedition for delivery as part of the proposed drug transaction.

The participants in the transaction, which was taking place at around 3:00 p.m., apparently became aware that law enforcement personnel were at the scene before the cocaine was removed from the Expedition. The Expedition and pickup fled from the scene. Before the pickup left, Contreras got into it. He abandoned the van. The Expedition was being driven so recklessly and at such high rates of speed that law enforcement officials were not able to continue to follow it. The officials, including officers in an air unit, were able to follow the pickup truck, which was being driven at a high rate of speed, to Webb's Bar & Grill in Irving, Texas. They observed the Expedition already parked in the parking lot at Webb's. As the truck passed through the parking lot, they observed someone jump into the bed of the truck, which then departed the area at a high rate of speed. That person was then seen going through a window at the back of the cab of the pickup into the cab. The officers were unable to follow the pickup truck because it was being driven too fast and recklessly. Ten kilograms of cocaine were found inside the Expedition.

The persons occupying the pickup when it arrived at Wal–Mart were not identified by the trial evidence. The investigators were able to determine that Aguilera was the driver of the Expedition. Vazquez was implicated as a participant in the transaction through eye-witness testimony of three law enforcement officers. He was identified as the passenger in the Expedi-

tion and as the person who jumped into the bed of the truck at Webb's.

Brad Johnson ("Johnson"), an employee of the Fort Worth police department who was assigned to the Drug Enforcement Administration office in Fort Worth, was serving as part of the monitoring team on May 12, monitoring conversations between the participants in the proposed transaction. He observed the Ford Expedition pull into the parking lot, and saw the two occupants exit the vehicle, walk towards the store, and then return to the area of the vehicle, where they stood near the rear of the vehicle. Johnson noticed that the passenger, whom he saw walk back to the passenger side, was looking around nervously at cars.

An identification tag from a cleaning establishment was found on clothing inside the Expedition when it was searched after having been found at Webb's. The tag identified the customer as Joe Lopez, and gave a telephone number, which the officers were able to trace to 5419 Lindsley Avenue, Dallas, Texas. Later in the day on May 12, law enforcement officers went to the Lindsley Avenue address, and observed a person standing on the porch. Johnson was one of the officers who observed the person on the porch. He said that the person on the porch was the same person whom he had seen earlier that day as the passenger in the Expedition. Johnson made a courtroom identification of Vazquez as that person.

George Courtney ("Courtney"), an employee of the Weatherford police department who was assigned to the Drug Enforcement Administration office in Fort Worth, was serving as a part of the surveillance and arrest team. He and others were in the Wal–Mart parking lot waiting for the drug transaction "to go down," with the intent to arrest the participants when it did. He saw the Expedition in the

parking lot, and concluded that its occupants, two Hispanic males, were engaged in counter-surveillance. He saw them exit the vehicle, walk toward the Wal–Mart store, talk on a cell phone, and then return to the Expedition. Throughout that time, they were focusing their attention on the place where the drug transaction was to take place. Courtney estimates that he observed the occupants of the Expedition about five to eight minutes as they were moving around the parking lot on foot. At one point the vehicle occupied by Courtney drove directly alongside the Expedition, going in the opposite direction, when he saw the passenger through the windshield. On more than one occasion he was within a few feet of the occupants of the Expedition. Courtney made a courtroom identification of Vazquez as the passenger in the Expedition.

Brian Finney ("Finney") is the third law enforcement officer who identified Vazquez as a participant in the May 12 transaction. Finney is a special agent with the Drug Enforcement Administration, and was part of the arrest team at the Wal–Mart parking lot on May 12, 2004. He observed the Expedition leaving the parking lot, and he participated in following the Ford pickup to Webb's. When the pickup drove through the parking lot at Webb's an Hispanic male jump into the bed of the truck, and then crawled through a sliding window at the back of the cab of the truck. Finney and those with him tried to continue to follow the truck, but were unsuccessful. He clearly saw the face of the person who jumped into the bed of the pickup. Finney made a courtroom identification of Vazquez as that person.

Vazquez elected not to testify. He produced alibi witnesses. Irma Vazquez ("Irma"), Vazquez's mother, testified that her husband, her daughter Veronica, Vazquez, and his daughter Alexi lived with her at 5419 Lindsley Avenue on May 12, 2004. She said Vazquez was at the house with her until he left at around 2:45 p.m. to pick up Alexi at school, and that she next saw him at around 3:15 p.m. when he returned with Alexi. Vazquez stayed at the house the remainder of the day. He was not employed in May 2004. Irma testified that Aguilera sometimes lived at the house at 5419 Lindsley Avenue, and she said that Aguilera and Veronica were planning to get married. Veronica, Vazquez's sister, testified that the morning of May 12 she was away from the residence, but she returned at around 2:15 p.m. Vazquez was there when she returned. He left at around 2:45 p.m. to pick up his daughter at school, and returned about 3:10 p.m., at which time Veronica left to go to work. She said that Aguilera is the father of her child. According to her, Aguilera uses the name "Joe Lopez" at the cleaning establishment where he has his clothing cleaned. When she returned from work at around 9:20 p.m. on May 12, Vazquez was at the residence.

The court has summarized above all trial evidence that implicated Vazquez in the aborted drug transaction.

## B. The Motion for New Trial and the Government's Response.

On November 8, 2004, the court signed an order scheduling Vazquez's sentencing hearing for 9:00 a.m. on February 25, 2005. To accommodate the court's schedule, the hearing was rescheduled for March 4. The afternoon of March 3, 2005, Vazquez filed his motion for new trial based on newly discovered evidence. The main ground of the motion is that Contreras and Aguilera have been taken into custody, and that Aguilera has provided information to the investigators exonerating Vazquez. Vazquez alleges that the new information

provided by Aguilera[1] discloses that: Vazquez was not involved in the aborted drug transaction. Jimmy Delbosque, a/k/a Jaime Delbosque, Jr., ("Jaime, Jr."), instead of Vazquez, was the passenger in the Expedition on the occasion in question. The driver of the pickup truck was Jaime Delbosque ("Jaime, Sr."), the father of the passenger in the Expedition. Aguilera was the driver of the Expedition.

Vazquez alleged in his motion that he believed that additional evidence would be forthcoming from Contreras, but that, as of that date, the government had not been able to interview Contreras because of unavailability of Contreras's attorney. Also, Vazquez alleges that he has become aware of information that Jaime, Sr., owned the pickup that was involved in the aborted transaction, and that Jaime, Jr., was arrested prior to May 12, 2004, while driving the Expedition that was involved in the May 12 drug transaction.[2] Vazquez alleges that Jaime, Jr., resembles Vazquez.

The government responded to the motion for new trial two hours after it was filed, alleging that the government was not prepared to take a position on the merits of the motion at that time, but expressing the belief that the interests of justice would best be served by continuing the sentencing hearing of Vazquez. In the response, the government summarized information it had obtained since Vazquez's trial. The summary was consistent with the allegations of the motion regarding the nature and source of the evidence Vazquez

characterized as newly discovered. While the government has not filed a further response to the motion for new trial, it has opposed the motion by its actions. During a March 21, 2005, telephone conference between the court and counsel, the court made known the court's belief that, in fairness, Vazquez should be granted a new trial. On behalf of the government, counsel for the government expressed disagreement.

## C. The Hearing on the Motion for New Trial.

On March 3, the court signed an order rescheduling Vazquez's sentencing hearing for March 18, and on March 16 the court signed an order setting a hearing on Vazquez's motion for new trial for March 17.

Vazquez, through counsel, called Aguilera and Contreras as witnesses. By the time of the hearing, Contreras had pleaded guilty to the offense charged by the indictment pursuant to a plea agreement virtually identical to the one Aguilera had made with the government. *Supra* at 7 n. 1. Also, Contreras entered into a Cooperation Agreement with the government in mid-February 2005, of the same kind Aguilera and the government had made. *Id.* Both of the co-defendants testified positively that Vazquez was not involved in any respect in the aborted drug transaction. They identified the passenger in the Expedition as Jaime, Jr., and they identified the

---

**1.** By the time the motion for new trial was filed, Aguilera had pleaded guilty to the offense charged by the indictment pursuant to a plea agreement that contemplated his cooperation with the government and the possibility of the filing by the government of a downward departure in favor of Aguilera based on his cooperation. Also, Aguilera entered into a Cooperation Agreement with the government in early February 2005, which contemplated that he would cooperate with the government

on a basis that self-incriminating information disclosed during his cooperation would not be used in determining any applicable sentencing guideline range.

**2.** The information about Jaime, Jr., having been arrested while driving the Expedition was not newly discovered evidence. Vazquez's counsel developed that fact upon questioning of a government witness at trial.

owner and operator of the Ford pickup truck that was involved in the transaction as Jaime, Sr. Vazquez offered into evidence photographs of Jaime, Jr. Witnesses were questioned concerning the similarity of appearance between Vazquez and Jaime, Jr.

The government called as witnesses at the hearing Johnson, Courtney, and Finney. Each of them forcefully affirmed his trial testimony identifying Vazquez as a participant in the transaction.

While there are obvious areas for effective cross-examination of Aguilera and Contreras, if a new trial is granted they undoubtedly will give favorable testimony for Vazquez that could cause a jury to have a reasonable doubt as to Vazquez's guilt.

## II.

### Analysis

■ Vazquez's motion was filed under the authority of Rule 33 of the Federal Rules of Criminal Procedure, which permits the filing of a motion for new trial grounded on newly discovered evidence within three years after the verdict. Rule 33 authorizes the court to vacate a judgment and grant a new trial "if the interest of justice so requires." However, the "interest of justice so requires" standard is restricted by case law when the motion is based on newly discovered evidence. In those cases, as a general rule, the movant

to be successful must as prerequisites prove that:

> (1) the evidence is newly discovered and was unknown to the defendant at the time of trial; (2) the failure to detect the evidence was not due to a lack of diligence by the defendant; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence if introduced at a new trial would probably produce an acquittal.

*United States v. Wall,* 389 F.3d 457, 467 (5th Cir.2004).

■ The government stipulated at the March 17 hearing to the existence of the first four prerequisites. Thus, the issues to be resolved are (1) whether Vazquez has proven that the newly discovered evidence if introduced at a new trial would probably produce an acquittal, and (2) if not, whether, nevertheless, the court is authorized to, and should, grant a new trial because of the peculiar circumstances of this case.

After having heard the evidence at the hearing on the motion for new trial, the court expressed the tentative finding that the court could not find that introduction of the newly discovered evidence at a new trial probably would cause the second jury to return a verdict of not guilty. Now that the court has thoroughly studied of the relevant parts of the record, the court persists in that view.[3] However, the court

---

**3.** The court assumes that "probably" in this context means "more likely than not." *See Schlup v. Delo,* 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). The Fifth Circuit has stated that "the likelihood of changing a jury's decision as a result of newly discovered evidence must rise considerably above the level of speculation." *United States v. DeVoe,* 493 F.2d 776, 780–81 (1974) (citation omitted). However, the court has found no Fifth Circuit precedent expressly defining "probably" in this context as "more likely than not." *Berry,* which the Fifth Circuit has cited as setting forth the prerequisites for

granting a new trial based on newly discovered evidence, *see United States v. Wall,* 389 F.3d 457, 467 (5th Cir.2004), treated the materiality and the "probably produce an acquittal" prerequisites as a single element: "That [the evidence] is so material that is would probably produce a different verdict, if the new trial were granted." *Berry v. State,* 10 Ga. 511, 1851 WL 1405 at *12 (1851). The *Berry* court then rephrased the question as: "Would [the new evidence] *be likely* to change the verdict which had been rendered." *Id.* at *13 (emphasis added). Moreover, the Su-

has concluded that the inability of the court to make such a finding is not the end of the matter.

The court finds that the interest of justice requires that the newly discovered evidence be made available to the jury at a new trial. Until that occurs, Vazquez will not have had a fair trial. While the jury might well find, after it hears and considers all the evidence, that the eye-witness accounts of the law enforcement officers are more reliable than the testimony of Contreras and Aguilera, fairness dictates that Vazquez have a trial at which the jury, in deciding whether the government has proved his guilt beyond a reasonable doubt, can take into account all of the now-available evidence on that subject. The newly discovered evidence affords reasonable ground to question the integrity of the verdict the jury rendered on November 8, 2004. And, Vazquez has demonstrated in support of his motion that there is a significant chance that the newly discovered evidence, developed by skilled counsel, could induce a reasonable doubt in the minds of enough jurors to avoid a conviction.

While the Fifth Circuit has said, without qualification, in some of its opinions that a movant *must* meet all of the prerequisites before being entitled to a new trial based on newly discovered. evidence, *see, e.g., United States v. Riley,* 544 F.2d 237, 240 (5th Cir.1976), many of the Fifth Circuit opinions contain a qualifier, *see, e.g., United States v. Wall,* 389 F.3d at 467 ("[a]s a *general rule,* there are five prerequisites"

preme Court has noted that the term "probably" has been confused with "reasonable probability." *Strickler v. Greene,* 527 U.S. 263, 300, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) (Souter, J., concurring and dissenting) (citing *Morris v. Mathews,* 475 U.S. 237, 247, 106 S.Ct. 1032, 89 L.Ed.2d 187 (1986) as treating "reasonable probability" as synonymous with "probably"). Considering the inconsistent use by courts of the words "likely,"

(emphasis added)); *United States v. Williams,* 613 F.2d 573, 575 (5th Cir.1980) ("must *ordinarily* show" the prerequisites (emphasis added)); and *United States v. Antone,* 603 F.2d 566, 568–69 (5th Cir. 1979) ("must *ordinarily* show" (emphasis added)). For example, "the standard applied for newly discovered evidence is slightly more lenient" if the government used testimony it knew or should have known was false. *Wall,* 389 F.3d at 473. A different standard applies if the newly discovered evidence goes to the fairness of the trial rather than to the question of guilt or innocence. *Williams,* 613 F.2d at 575. A relaxed standard applies if the government, although not soliciting false evidence, allows it to go uncorrected when it appears. *Antone,* 603 F.2d at 569 (saying that, in such an event, the test for whether a new trial should be granted would be whether "there was any reasonable likelihood that the false testimony would have affected the judgment of the jury").

The flexibility the Fifth Circuit has shown as to the fifth prerequisite (that the evidence, if introduced at a new trial, would probably produce an acquittal) undoubtedly arises from the importance the Fifth Circuit attaches to the goal of avoiding injustice. On the matter of the seriousness of the decision the court must make in determining whether a new trial should be granted on the basis of newly discovered evidence, the Fifth Circuit admonished in *Newman v. United States* that:

"probably," "possibility," "probability," and similar words in various contexts, the court questions whether some lesser standard might be intended by the use of the word "probably" in this context. *See id.* at 299–301, 119 S.Ct. 1936 n. 3. If some lesser standard, such as "reasonable probability" or perhaps even "as likely as not," were applicable, the court might find that such a standard had been met.

Not to be forgotten is the decisive factor that relief being pursued was a request for a new trial because injustice had been done. That presented a solemn, serious matter, the solution of which was the very act of adjudication, the full exercise of the judicial function. This called for considerate deliberation and decision as a Judge, weighing carefully all that would indicate whether justice or injustice had been the result.

238 F.2d 861, 862 (5th Cir.1956).

Almost directly on point in principle to the instant case is the opinion of the Fifth Circuit in *Ledet v. United States,* 297 F.2d 737 (5th Cir.1962). The defendant, Ledet, was convicted of possession of drugs based on evidence that the drugs were under the seat in a vehicle in which Ledet was sitting. The vehicle was being operated by a co-defendant, Bourg, who also was convicted of possession of the drugs. Bourg elected not to testify at trial. Ledet testified that he knew nothing of the drugs in the vehicle. After Bourg was sentenced to six years in the penitentiary and Ledet to seven, Bourg provided Ledet with an affidavit seeking to exculpate Ledet completely. Bourg said in his affidavit that Ledet knew nothing about the presence of the drugs in the vehicle. After the Fifth Circuit had affirmed Ledet's conviction, he filed a motion for new trial based on Bourg's affidavit.

The Fifth Circuit commenced its legal analysis in *Ledet* by listing the prerequisites that a new trial movant "must ordinarily meet" in order to prevail. However, the Court did not hold Ledet to the burden of proving the "would probably prevail at a new trial" prerequisite. Instead, the Court, in the course of reversing the trial court and ordering that a new trial be granted, explained:

> We must conclude that under *the peculiar circumstances of this case,* involving as it does the ambiguous facts touching on possession; that is, the fact that total and complete possession by Bourg, the owner and driver of the automobile would be entirely consistent with Ledet's complete innocence or knowledge of, or dominion over, the narcotics, requires that a new trial be granted in order that the previously silent witness who knows most about the transaction may be given an opportunity to testify to facts that he has now asserted in the form of an affidavit.

297 F.2d at 739 (emphasis added).

■ Perhaps the exception recognized by the Fifth Circuit in *Ledet* to the five-prerequisite rule can be labeled "the peculiar circumstances" exception. Certainly *Ledet* stands for the proposition that the trial judge is authorized to grant a new trial if the motion is based on newly discovered evidence of witnesses who have direct knowledge of the guilt or innocence of the defendant and who have indicated that their testimony will be to facts establishing the defendant's innocence. This is such a case. Also, while the eye-witness identification of Vazquez by the law enforcement officers cannot, if accurate, be reconciled with Vazquez's innocence, the possibility that the officers, even though acting in good faith, mistakenly identified Vazquez is consistent with his innocence. Under the circumstances, a new trial should be granted in order that the previously silent witnesses, Contreras and Aguilera, "who know[ ] most about the transaction may be given an opportunity to testify to facts that [they have] now asserted." *Id.*[4]

---

**4.** In *United States v. Metz,* the Fifth Circuit distinguished *Ledet,* explaining that in *Ledet*

the Court went on to find that in view of all the particular circumstances of that case,

Another application by the Fifth Circuit of the "peculiar circumstances" exception (if it properly can be called that) is *Newsom v. United States*, 311 F.2d 74 (5th Cir.1962). Defendant Newsom and co-defendant Linton were indicted on two counts charging sale of marijuana. The jury returned a verdict finding Newsom guilty on each count. Linton's case was severed from Newsom's, and Linton pleaded guilty on June 20, 1962. On June 20, within five days after he was convicted and sentenced, Newsom filed a motion for new trial. On June 28 he filed an amended or supplemental motion based on claimed newly discovered evidence in the form of a certified copy of Linton's plea proceedings during which Linton said that Newsom had no knowledge of what Linton was doing that night and that he was sorry that he got Newsom in trouble. Also attached to the amended or supplemental motion was an affidavit from Linton exonerating Newsom and an affidavit from Linton's attorney saying that Linton was requested to testify on behalf of Newsom at Newsom's trial, but declined to do so because he could not testify without incriminating himself. The trial court denied the motion for new trial. Rather than to require proof of the fifth prerequisite, the Fifth Circuit stated that the applicable standard was whether "[a]nother jury may reasonably find the [newly discovered evidence] sufficiently credible to raise a reasonable doubt as to the truth and meaning of the testimony of [the witness who had testified against Newsom] and hence of the defendant's guilt." *Id.* at 79. In the

which involved ambiguous facts either completely exonerating or absolutely convicting the defendant, a new trial was warranted. 652 F.2d 478, 480 (5th Cir.1981). The instant case meets that test. If Aguilera and Contreras are believed, Vazquez would be completely exonerated. If the eye-witnesses are believed, he would be absolutely convicted.

course of reversing the trial court, and ordering a new trial, the Fifth Circuit explained:

> Every practicable precaution should be taken to insure that the verdict really speaks the truth, for if it does not an innocent man may be imprisoned for years. We hold, therefore, that, under the *peculiar circumstances of this case*, the district court erred in denying the defendant's motion for new trial.

*Id.* (emphasis added).[5]

The court concludes that the peculiar circumstances of the instant case dictate that a new trial should be granted. Another jury may reasonably find the newly discovered evidence sufficiently credible to raise a reasonable doubt as to the accuracy of the identification testimony of the law enforcement officers, and hence of Vazquez's guilt, or it may not so find.

## III.

### Order

For the reasons given above,

The court ORDERS that Vazquez's motion for new trial be, and is hereby, granted, and that the verdict returned by the jury on November 8, 2004, finding Vazquez guilty of the offense charged by Count One of the indictment be, and is hereby, set aside.

5. The sentencing information the court now has discloses that, if Vazquez is guilty of the offense charged by the indictment, he will be exposed to a mandatory life sentence, not just imprisonment for a certain number of years. The mandatory life sentence would be the product of the nature of the offense charged by the indictment plus Vazquez's history of three prior felony drug offenses.